FILED
United States Court of Appeals
Tenth Circuit

July 29, 2015

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

NAM QUOC LE, a/k/a Jimmy Nam Quoc Le,

    Defendant-Appellant.

No. 14-5080

(D.C. No. 4:14-CR-00007-GKF-1)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE, BALDOCK,** and **EBEL,** Circuit Judges.
_____

Defendant Nam Quoc Le pleaded guilty to a single count of Theft From Gaming Establishments on Indian Lands, in violation of 18 U.S.C. §1167, based on a cheating scheme that ran from at least January 14, 2013, to February 16, 2013. The only issue in this appeal is the amount of restitution Defendant owes the Casino where he cheated. Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C § 3742, we affirm the district court's restitution calculation method, but remand for the court to correct a minor but clear error it committed while performing that calculation.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

I.

At least as early as mid-January 2013, Defendant joined forces with Misty White, a blackjack dealer at Osage Casino, in order to cheat at blackjack. Although blackjack rules can vary from casino to casino, the basic goal is to get a combination of cards worth more than the combination dealt to the dealer, but no greater than 21 ("bust"). After being dealt an initial two cards, the player must choose whether to ask for another card ("hit") which he can do as many times as he likes before exceeding 21, or to "stay" with the cards he has been dealt thus far. If the player's combination ends up being less than the dealer's, or exceeds 21, he loses his bet. If the player and the dealer tie, there is a "push," and the player keeps his bet. If the player's cards are worth more than the dealer's, or the dealer exceeds 21, the player wins the amount he bet. If the player's initial two cards are an ace and a face card then he has a blackjack, and if the dealer does not also have a blackjack, the player wins 150% of his bet. Defendant and Ms. White's cheating scheme involved Ms. White, as the dealer, discretely showing Defendant the next card he would be dealt if he chose to hit (the "hole card"). This way, Defendant knew ahead of time whether hitting would increase his odds of beating the dealer, or would instead cause him to bust.

With this advantage up his sleeve, Defendant's gambling habits changed markedly. He began betting more money per hand, and would quit while he was ahead rather than gambling until he'd lost any winnings he might have amassed, as he had in the past. Indeed, Defendant's winnings/losses from June 29, 2010 through November 27, 2012 totaled negative $120,267 but his winnings/losses from December 4, 2012 through

February 13, 2013 totaled positive $96,891. This dramatic change in fortune piqued the interest of the Casino's Table Games Director, Ken Shepherd, who initiated the Casino's investigation of Defendant. The investigation revealed that Defendant often followed Ms. White as she moved from table to table, and ultimately the Casino captured on video Ms. White flashing hole cards to Defendant in 119 out of the 228 hands played from February 12 through February 16. The Casino terminated Ms. White on February 16, 2013, and she ultimately pleaded guilty to Theft by an Employee of Gaming Establishment on Indian Lands in excess of $1,000. Ms. White then cooperated with the government by describing Defendant's role in the scheme. As a result, Defendant was charged with, and pleaded guilty to, one count of Theft From Gaming Establishments on Indian Lands, in violation of 18 U.S.C. §1167.

Defendant's Presentence Report (PSR) calculated the restitution Defendant owed the Casino under the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A, to be $59,936.50, which Defendant owed jointly and severally with Ms. White. This number was based on (1) Defendant's winnings during the times Ms. White was working from January 12, 2013 through February 16, 2013 as recorded on Defendant's "Konami card"[1] and (2) Ms. White's restitution order for the same amount. Unlike Ms. White, Defendant objected to the PSR's restitution calculation. He argued the Casino's "Konami card" records were not precise and were inflated because the Konami card does

---

[1] The Konami card is a casino management system which tracks the holder's gambling patterns, wins, and losses, primarily for marketing purposes. It automatically tracks wins and losses for slot machines, but wins and losses from table games must be manually entered into a computer by casino staff.

not automatically register winnings for table games like blackjack so the Casino managers must manually observe and enter a player's winnings/losses into the Konami system, leaving room for human error. Defendant also asserted that the Konami card system showed there were times that Ms. White was working but he gambled at a table other than the one Ms. White was dealing at, and that the Konami card records did not add up with the video records of his cheating scheme. Given these issues, Defendant argued the restitution order should be calculated by taking the discrete instances in which he was caught cheating on camera, and using statistics to extrapolate the win/loss results of that sample of discrete "cheats" to cover the total amount of time he played blackjack during the period in which he was engaged in this scheme.

At Defendant's sentencing hearing, Mr. Shepherd testified that the Casino's win/loss records for particular players are "almost spot on," but admitted they may not be 100% accurate all the time. Shepherd also agreed that the most accurate way to calculate loss would be if there were records of each individual hand played. Defendant then had a statistics professor testify as an expert to explain how one could use a sample size comprised of the video recorded instances of Defendant's cheating and extrapolate the amount of loss from that sample. The statistics expert opined that, based on the video record sample, the amount of loss attributable to discrete "cheats" was only about $6,363.63 assuming one defined (1) a "cheat" as only those instances where Ms. White flashed a hole card *and* Defendant then deviated from what a typical blackjack player would do with no knowledge of the hole card, and (2) loss as only the amount of the Casino's payout to Defendant as a result of those "cheats." The government also offered,

in its sentencing memorandum, an alternative extrapolation method for calculating restitution. Using the same data as Defendant's expert, but defining cheating more broadly (under the premise that Defendant's cheating altered the entire course of the game) and defining loss as not only the money Defendant won, but also the money he would have otherwise lost to the Casino, the Government arrived at an extrapolated loss amount of about $82,300.

Ms. White also testified at the hearing. She stated that, in return for her flashing hole cards, Defendant tipped her between $4,000 and $5,000 over the course of the scheme. She also stated that, based on her firsthand knowledge of the scheme, $59,000 was a fair estimate of the loss suffered by the Casino as the result of the cheating scheme and that, although she didn't know the exact amount, the actual loss attributed to the scheme could not be less than $59,000.

After hearing the evidence, the court noted that Defendant and the government were essentially asking it to do a variation of the same thing (extrapolate), but then remarked: "Another way to look at it is [Defendant] cheat[ed] the entire time between . . . January 13th and February 14th. You take [his] gains, you subtract [his] losses, and that's the loss to the Casino." The court also noted that Defendant's asserted restitution amount was not plausible because he gave Ms. White more than half that amount in tips. Ultimately, the court adopted the PSR's restitution calculation of $59,936.50, but credited Defendant for the periods of play during the scheme that resulted in net losses of $19,299.50 under U.S.S.G § 2B1.1. According to the court, "this reduction resulted in a

restitution amount of $41,436.50," and it ultimately imposed restitution in that amount. Defendant timely appealed.

## II.

"We review the district court's application of the MVRA de novo and its factual findings for clear error, while ultimately assessing the amount of the restitution award under an abuse of discretion standard." United States v. Ferdman, 779 F.3d 1129, 1131 (10th Cir. 2015). "[T]he principal aim" of restitution under the MVRA is to "restor[e] victims to the position they occupied before the crime." Id. at 1132. "Any dispute as to the proper amount . . . of restitution shall be resolved by the court by a preponderance of the evidence. The burden of demonstrating the amount of loss sustained by the victim as a result of the offense shall be on . . . the Government." 18 U.S.C. § 3664(e). That said, "the restitution phase of criminal sentencings should [not] become a substitute for civil trials." Ferdman, 779 F.3d at 1133. "Speculation and rough justice are not permitted." Id. (quoting United States v. Anderson, 741 F.3d 938, 954 (9th Cir. 2013)). But "the MVRA does not require a court to calculate a victim's actual loss with exact precision." Id.

Defendant argues the district court committed clear error by failing to consider credible evidence that supported Defendant's extrapolation theory. This is simply untrue. The court acknowledged that it had essentially three options before it for calculating restitution, all supported by some evidence: (1) Defendant's extrapolated amount of $6,363.63, (2) the government's extrapolated amount of $82,300, or (3) the middle road amount of Defendant's net winnings minus his net losses over the course of his blackjack

-6-

cheating scheme. The court properly considered Defendant's extrapolation evidence, but rejected the number it yielded as inconsistent with other evidence, namely, the amount Defendant had tipped Ms. White for her role in the scheme.

Defendant relies primarily on Hughey v. United States, 495 U.S. 411 (1990), and its progeny to argue that the district court impermissibly held him responsible for uncharged relevant conduct. In Hughey, the defendant had been charged with a single act of credit card fraud involving a loss to the victim of $10,412, but there was evidence the defendant had committed other related fraud causing total losses of $147,646.89. The district court ordered restitution in the larger amount based on the relevant uncharged conduct, but the Supreme Court reversed. In reversing the district court, the Court stated that the VWPA, predecessor to the MVRA, "is intended to compensate victims only for losses caused by the conduct underlying the offense of conviction." Id. at 416. Defendant argues he pleaded guilty to cheating, and so the amount of loss should cover only the amount the Casino paid him for the particular hands where he cheated—*i.e.*, was flashed a hole card *and* deviated from basic blackjack strategy.

Defendant's reliance on Hughey and its progeny is misplaced. For one thing, Defendant's guilty plea admits that, from at least mid-January through February 16, 2013, he engaged in a cheating "scheme . . . designed to give [him] an advantage in the blackjack game" at the Casino. This overarching scheme was therefore just as much the basis for the offense of conviction as any particular hands in which Defendant took advantage of his ability to see a hole card. And Defendant's attempt to define cheating as only those instances where he was flashed a hole card and deviated from basic blackjack

-7-

strategy ignores the overall advantage he gained from this scheme and the way in which his gambling habits changed as a result of that advantage. Moreover, Defendant's narrow definition of loss risks benefitting him while undercompensating the Casino because it fails to account for the fact that, when he cheated at a hand and won, the Casino lost not only its payout but also potentially lost the bet Defendant would have forfeited to the Casino had he not cheated and then lost the hand.

Rather than adopt the extrapolation approach, which requires sifting through expert testimony and conflicting definitions of "cheating" and "loss," the district court chose to simply restore both Defendant and the Casino to essentially the positions they occupied before Defendant initiated his cheating scheme. This approach is consistent with our precedent interpreting the MVRA, which aims to "restor[e] victims to the position they occupied before the crime," and disfavors turning "the restitution phase of criminal sentencings" into "a substitute for civil trials." Ferdman, 779 F.3d at 1132–33.

Defendant argues the court's calculation is based on Casino records that are flawed for various reasons. But the court's calculation is supported by the testimony of Mr. Shepherd, who stated that the Casino's records were "almost spot on," and the testimony of Defendant's partner in crime, who stated that $59,000 was a fair and indeed bare-minimum estimate of the loss attributable to the cheating scheme. And the MVRA does not require exact precision, anyway. Id. at 1133. Given that record evidence supports the court's calculation method, we cannot say the court abused its discretion by choosing to award restitution in the amount of Defendant's net winnings minus his net losses over the course of his blackjack cheating scheme.

III.

Although we affirm the court's restitution calculation *method* as consistent with the law and the sentencing guidelines, we note that the court appears to have committed a minor arithmetical error that rendered its ultimate restitution award clearly erroneous. The court essentially adopted the PSR's restitution calculation of $59,936.50 but then credited Defendant for the periods of play during the scheme that resulted in a net loss of $19,299.50 under U.S.S.G. § 2B1.1. According to the court, "this reduction resulted in a restitution amount of $41,436.50," and it ultimately imposed restitution in that amount. But $59,936.50 minus $19,299.50 equals a loss to the Casino of $40,637.00, not $41,436.50. Accordingly, we REMAND with the limited instruction that the district court correct this clear arithmetical error.

Entered for the Court,


Bobby R. Baldock
United States Circuit Judge